**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**RAEQUAN BATTLE,**

     **Plaintiff,**

**v.**

**NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION,**

     **Defendant.**

> ELECTRONICALLY
> FILED
> 12/07/2023
> U.S. DISTRICT COURT
> Northern District of WV

Civil Action No. <u>1:23-cv-101 Kleeh</u>

---

**COMPLAINT**

---

Plaintiff RaeQuan Battle ("Plaintiff") brings the following causes of action and seeks an injunction forbidding Defendant from enforcing its arbitrary and capricious decisions, breaching its contracts with its member institutions, and preventing him from participating in college sports.

## PARTIES

1.     Plaintiff RaeQuan Battle is a resident of Morgantown, West Virginia.

2.     Defendant National Collegiate Athletic Association, also known as the NCAA, is a collective of colleges and universities headquartered in Indianapolis, Indiana, which does business and participates in collegiate sports throughout the United States and in select foreign countries.

## JURISDICTION AND VENUE

3.     This matter deals with collegiate sports in Morgantown, West Virginia.

4.      The parties are completely diverse.

5.      Damages in this matter are more than $75,000.

6.      This Court may exercise personal jurisdiction over Defendant because Defendant currently transacts business in the Clarksburg Division of the Northern District of West Virginia.  Defendant and its member institutions conduct athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities in the Northern District of West Virginia.

7.      This Court has jurisdiction over the federal antitrust claims in this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 26 of the Clayton Act, 15 U.S.C. § 26, and under 28 U.S.C. §§ 1331 and 1337.

8.      Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. 22, and under 28 U.S.C. § 1391(b)(2)

9.      Based on the facts stated above and herein, and the statutory and case law of West Virginia, the United States District Court, Northern District of West Virginia, has diversity jurisdiction over the causes and claims asserted in this Complaint.

10.     Based on the facts stated above and herein, and the statutory and case law of West Virginia, the United States District Court, Northern District of West Virginia, has pendent jurisdiction over the causes and claims asserted in this Complaint.

11.     Based on the facts stated above and herein, venue is proper in the Northern District of West Virginia.

## FACTUAL BACKGROUND

### RAEQUAN BATTLE

12.     RaeQuan Battle is a 22-year-old college student at West Virginia University.

13.     He grew up on the Tulalip Indian Reservation adjacent to Marysville, Washington.

14.     A basketball star, RaeQuan initially enrolled at the University of Washington following high school.

15.     But personal issues made staying at the University of Washington impossible.

16.     This, combined with the COVID-19 pandemic, childhood trauma, and the stress of college, ultimately led Plaintiff to seek counseling for his mental health with the Lakeside-Milam Drug and Alcohol Program.

17.     Then, in addition to dealing with that stress and anxiety, both his grandmother and his great-aunt passed away after he enroled at the University of Washington.

18.     Finding that his personal issues were magnified so close to home, Plaintiff ultimately transferred to Montana State University.

19.     There, Plaintiff's personal issues, however, were only to get worse: one of his brothers died from a drug overdose, another was sentenced to house arrest, and his younger brother—suffering from schizophrenia—physically attacked Plaintiff.

20.     As the emotional toll of his personal life became more and more difficult to overcome, Plaintiff found himself increasingly dependent upon basketball as a constructive outlet.

21.     Increasingly reliant on Montana State basketball coach Danny Sprinkle for support, Plaintiff soon found himself depressed and suffering from mood swings and sleep deprivation.

22.     Then Coach Sprinkle announced that he was leaving Montana State for Utah State. With Coach Sprinkle leaving, the Plaintiff's main source of emotional and mental support was gone.

23.     Though NCAA rules would have allowed him to transfer there and play basketball immediately, Plaintiff could not have followed Coach Sprinkle to Utah State without accepting a significant setback to his academic progress and delaying his graduation date.

24.     Wanting to finish his college career and obtain a college degree within a reasonable period of time and realizing that he could not stay at Montana State University without the loss of Coach Sprinkle weighing on him heavily, Plaintiff then sought out other schools that he thought would be a good fit for his unique set of challenges.

25.     The school that he found was West Virginia University.

26.     He had heard from Coach Sprinkle that West Virginia University had a history of working with students from difficult backgrounds.

27.     He found a kindred spirit in Coach Josh Eilert, who had also lived on an Indian Reservation when younger.

28.     He discussed his mental health issues with West Virginia University and found them willing and able to help him.

29.     At West Virginia University Plaintiff hoped to continue his basketball career, as it had always been such a supporting force and constructive outlet for him.

30.     Not only that, but his basketball skill and renown enabled him to sign a name, image, and likeness ("NIL") contract.

31.     Recognizing the role basketball has played in his life, and the role it would likely play in him successfully completing college and his counseling, Plaintiff then applied for a waiver of the NCAA transfer rules based upon his well-being.

32.     The issue was that because Plaintiff had transferred from the University of Washington to Montana State, the NCAA would limit his ability to play for West Virginia University immediately.

33.     As part of its rules and regulations, NCAA Bylaw 14.5.5.1 states that "[a] transfer student from a four-year institution shall not be eligible for intercollegiate competition at a member institution until the student has fulfilled a residence requirement of one full academic year (two full semesters or three full quarters) at the certifying institution."

34.     Conversely, NCAA Bylaws also include certain enumerated exceptions to Rule 14.5.5.1 and include mechanisms for waiving or exempting an individual or institution from the application of a specific regulation.

35.     Specifically, NCAA Bylaw 14.02.14 states that "[a] waiver is an exempting an individual from the application of specific regulation. A waiver requires formal approval (e.g., an NCAA committee or a conference, as specified in the legislation) based on evidence of compliance with the specified condition or criteria under which the waiver is authorized or extenuating circumstances."

36.     Likewise on January 11, 2023, the NCAA issued guidelines under which it would issue waivers based upon the mental well-being of college student-athletes such as Plaintiff.

37.     Specifically, those guidelines state that "***relief should be provided*** in cases where the applicant institution provides evidence the student-athletes mental health condition(s) impaired the student-athlete's daily function at the previous institution and necessitated transfer to applicant institution" (emphasis added).

38.     Such waivers are not uncommon and are often granted for a variety of reasons.

39.     Following the NCAA's rules, regulations, bylaws, and guidelines, Plaintiff applied for a waiver based upon his mental health.

40.     As part of his application and subsequent appeals, Plaintiff provided multiple pieces of evidence that his mental health conditions impaired Plaintiff's daily function at his previous school and necessitated his transfer to WVU.

41.     However, the NCAA summarily denied Plaintiff's waiver for what can only be arbitrary and capricious reasons.

42.     Upon information and belief, the NCAA did *not* have any medical professional or other independent professional or expert evaluate Plaintiff's application.

43.     The NCAA did *not* have any medical or other professional or expert meet with, interview, speak with, or otherwise evaluate Plaintiff.

44.     Nor did the NCAA—upon information and belief—have any medical professional or other independent professional or expert evaluate the statements by Plaintiff's treaters and other providers that were submitted to the NCAA.

## THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

45.     The National Collegiate Athletic Association is a voluntary, self-governing collection of four-year colleges, universities and conferences allegedly committed to the well-being and development of student-athletes, to sound academic standards, the academic success of student-athletes, and to diversity, equity and inclusion.

46.     The NCAA regulates intercollegiate sports, including establishing the rules for sports competitions and participation in sports and conducts all NCAA championships, including that for men's basketball.

47.     As part and parcel of their membership in the NCAA, universities and colleges must agree to comply with the rules and regulations set forth by the NCAA as well as agree to ensure that their student-athletes are in good standing with the NCAA.

48.     An institution's membership in the NCAA may be suspended, terminated, or otherwise disciplined (including loss of or reduction in rights to participate in governance processes or financial penalties) for a failure to abide by the principles stated in the NCAA's governing documents.


## THE BUSINESS OF COLLEGE SPORTS

49.     College sports is big business and the NCAA is the biggest player in that business.

50.     In fact, the NCAA has both monopsony power over the services of college athletes and monopoly power over the performance and broadcasts of college sports in the relevant market hereto.

7

51.     The relevant market is the nationwide market for the labor of NCAA Division I college basketball players. In this labor market, current and prospective college students compete for roster spots on Division I basketball teams. NCAA Division I member institutions compete to obtain and retain the best Division I basketball players by paying in-kind benefits, namely, Division I basketball scholarships, access to academic programs, access to training facilities, and instruction from premier coaches. In some cases, the capped compensation includes pay in cash, through the provision of a housing and food allowance, but in all cases, the amount of in-kind and cash compensation is strictly capped.

52.     The relevant geographic market is the United States. All Division I basketball teams are located in the U.S. As a uniquely American sport, the vast majority of Division I basketball players are from the United States. Schools that participate in the Power Five conferences[1] recruit athletes throughout the nation.

53.     The NCAA enjoys near complete dominance of, and exercises monopsony power in, the market for athletic services in men's and women's Division I basketball.

54.     The NCAA's broadcast contract for the NCAA championship in basketball is more than $1 billion annually.

55.     The NCAA also controls the National Invitation Tournament, the second most prominent post-season tournament in college basketball.

---

[1] The Power Five conferences (the Atlantic Coast Conference [ACC], the Big Ten Conference, the Big Twelve Conference, the Southeastern Conference [SEC], and the Pacific Twelve Conference [PAC-12]) represent the five most influential and largest revenue earning conferences in college sports.  West Virginia University is a member of the Big Twelve Conference.

56.   Between these two tournaments, the NCAA completely dominates the market for post-season college basketball.

57.   There are no viable substitutes for the NCAA as the NCAA's Division I collegiate division essentially is the relevant market for elite college football and basketball.

58.   The NCAA has the power to restrain trade in the college basketball market in any way and at any time they wish, without any meaningful risk of diminishing their market dominance.

59.   The business activities of Defendant that are the subject of this action were and are within the flow of, and substantially affected and affect, interstate trade and commerce.

60.   During the relevant periods in time, Defendant transacted business in multiple states in a continuous and uninterrupted flow of interstate commerce throughout the United States.

61.   Defendant's contracts, combinations, and relationships consist of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendant and its members, vendors, and customers, the substantial terms of which are to artificially fix, decrease, maintain, and/or restrict the amount of college athletic services in the United States, its territories and possessions.

62.   Simultaneously Defendant's contracts, combinations, and relationships consist of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendant and its members, vendors, and customers, the substantial terms of which are to artificially fix, increase, maintain, and/or inflate prices paid for the

performance and/or broadcast of college sports contests in the United States, its territories and possessions.

63.     And/or, alternately, Defendant's contracts, combinations, and relationships consist of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendant and its members, vendors, and customers, the substantial terms of which are to artificially fix, depress, maintain, and/or stabilize prices paid for collegiate athletic services in the United States, its territories and possessions.

64.     Defendant's actions blatantly restrict commerce and competition.

65.     As an example, the NCAA's January 11, 2023 transfer guidelines state that waiver requests which involve transferring "to an institution within a 100-mile radius from the student-athlete's home or support system" will be looked upon more favorably than others.

66.     Such guidelines necessarily, therefore, restrict competition among college student-athletes by steering them to select geographic regions and restricting their transfers outside of an arbitrary 100-mile radius of their hometown.

67.     Moreover, such an arbitrary guideline gives *no* consideration to college student athletes such as Plaintiff who has determined that the best course of action for his well-being is instead to place distance between his home and himself.[2]

---

[2] Plaintiff notes here the arbitrary and capricious nature of this guideline is especially worrisome for Native American athletes who grew up on reservations or other tribal lands where there may be *no* NCAA institution within 100 miles of their home.  There are just two Division I institutions, four Division II, and two Division III NCAA institutions within 100 miles of Plaintiff's hometown and Plaintiff already transferred away from one of them for the sake of his well-being.

## COUNT I
## TORTIOUS INTERFERENCE — SCHOOL

68.    The Plaintiff incorporates by reference every allegation contained in this Complaint into this Count.

69.    Plaintiff has a contractual relationship with West Virginia University.

70.    As part and parcel of that relationship, Plaintiff is entitled, and indeed expected, to participate on the varsity basketball team.

71.    The NCAA was aware of this relationship.

72.    The NCAA has interfered with the relationship between Plaintiff and West Virginia University and the expectancies of Plaintiff and West Virginia University.

73.    The NCAA's interference includes, but is not limited to, refusing to grant Plaintiff a waiver when he is entitled to one, acting arbitrarily and/or capriciously with regard to Plaintiff and his eligibility, ignoring Plaintiff's rights, and violating the NCAA's own rules and guidelines.

74.    The NCAA had a duty not to tortiously and/or needlessly interfere in Plaintiff's relationships, and especially had a duty not to refuse to follow its own rules, regulations, bylaws, and guidelines, or to act arbitrarily and/or capriciously with regard to Plaintiff.

75.    The NCAA's interference with the relationship between West Virginia University and Plaintiff has harmed Plaintiff.

76.    Plaintiff is entitled to damages for the NCAA's interference.

## COUNT II
## TORTIOUS INTERFERENCE  — OTHER

77.     The Plaintiff incorporates by reference every allegation contained in this Complaint into this Count.

78.     Plaintiff has a contractual relationship with the Country Roads Trust.

79.     Plaintiff has a contractual relationship with other third parties for the use of his name, image, and likeness.

80.     As part and parcel of those relationships, Plaintiff is expected to be a prominent athlete in the community and the nation as a whole.

81.     The more prominent the plaintiff is as a student-athlete the more valuable those relationships become.

82.     The NCAA knew or should have known about these relationships.

83.     The NCAA has interfered with the relationship between Plaintiff and Country Roads Trust and the expectancies of Plaintiff, Country Roads Trust and the third parties.

84.     The NCAA's interference includes, but is not limited to, refusing to grant Plaintiff a waiver when he is entitled to one, acting arbitrarily and/or capriciously with regard to Plaintiff and his eligibility, ignoring Plaintiff's rights, and violating the NCAA's own rules and guidelines.

85.     The NCAA had a duty not to tortiously and/or needlessly interfere in Plaintiff's relationships, and especially had a duty not to refuse to follow its own rules, regulations, bylaws, and guidelines, or to act arbitrarily and/or capriciously with regard to Plaintiff.

86.     The NCAA's interference with the relationship between Country Roads Trust and other third parties and the Plaintiff has harmed Plaintiff.

87.     Plaintiff is entitled to damages for the NCAA's interference.


## COUNT III
## BREACH OF CONTRACT – THIRD PARTY BENEFICIARY

88.     The Plaintiff incorporates by reference every allegation contained in this Complaint into this Count.

89.     "The National Collegiate Athletic Association is a member-led organization dedicated to the well-being and lifelong success of college athletes."[3]

90.     The NCAA is in essence and is formed by a collection of agreements and conventions between its members.

91.     As part and parcel of the agreements that form the NCAA, member institutions must offer certain consideration such as ensuring that student-athletes are in good standing, submit documentation demonstrating compliance with academic programs, and submit financial data to the NCAA.

92.     In exchange, the NCAA offers its member institutions the opportunity to play collegiate sports.

93.     As such, the NCAA essentially exists as one or more agreements between its members to administer and promote college athletics.

94.     Student-athletes are the purported beneficiaries of these agreements, a point made explicit by the NCAA:

---

[3] NCAA 2021 IRS Form 990.

    a.   "With more than 1,100 member colleges and universities, the NCAA is united around *one goal*, creating opportunities for college athletes."[4]

    b.   "The National Collegiate Athletic Association is a voluntary, self-governing organization of four-year colleges, universities and conferences committed to the well-being and development of student-athletes…"[5]

    c.   "The basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics, including national championships, as an integral part of the education program and the student-athlete as an integral part of the student body."[6]

95.    Thus, even though student-athletes are not parties to the contracts between the NCAA and its member institutions, those agreements were made for the specific benefit of a designated class of which Plaintiff is a member.

96.    The NCAA and its member institutions were competent to enter into the agreements that form the NCAA and allow its member institutions access to the college sports market as administered and controlled by the NCAA.

97.    Those agreements are legal, valid, enforceable contracts.

98.    Student athletes such as Plaintiff were specifically contemplated as beneficiaries of those agreements.

99.    As part of those agreements, the NCAA agreed—either implicitly or explicitly—that it would make its decisions and enforce its rules in compliance with its stated rules, regulations, bylaws, and guidelines and do so in a non-arbitrary, non-capricious manner.

---

[4] NCAA 2021 IRS Form 990 (emphasis added).
[5] NCAA Constitution, Preamble.

[6] NCAA Constitution, Preamble.

100.    Any and all necessary conditions and/or precedents, dependent obligations, and/or dependent covenants have been met to enforce that portion of the agreements.

101.    Defendant NCAA breached the agreements when it arbitrarily and capriciously denied Plaintiff the ability to play collegiate sports in contravention of the NCAA's own rules, regulations, bylaws, and guidelines.

102.    Plaintiff has standing to sue Defendant under such a breach as a third-party beneficiary to said agreements.

103.    Plaintiff is entitled to Defendant's performance under the agreements.

104.    Plaintiff has been harmed by Defendant's breaches.

105.    All conditions precedent to filing this breach of contract count have been fulfilled.

**COUNT IV**
**PROMISSORY ESTOPPEL**

106.    The Plaintiff incorporates by reference every allegation contained in this Complaint into this Count.

107.    By promulgating rules, regulations, bylaws, and guidelines the NCAA made certain promises to college student athletes.

108.    By continually espousing that its main goal is a commitment to student athlete welfare, the NCAA made certain promises to college student-athletes.

109.    By granting waivers from its rules and regulations, the NCAA made certain promises to college student-athletes.

110.    Those promises include, but are not limited to, promises that the NCAA would apply its rules, regulations, bylaws, and guidelines uniformly and fairly in a non-arbitrary and non-capricious manner.

111.    Those promises include, but are not limited to, promises that the NCAA would not make arbitrary and capricious decisions when it came to college student athletes' welfare, including the mental health of college student-athletes.

112.    Those promises include, but are not limited to, promises that the NCAA would consider and take into special account situations where adherence to NCAA rules and regulations would harm college student athletes' welfare, including the mental health of college student-athletes.

113.    Those promises include, but are not limited to, promises that the NCAA would follow its own guidelines when considering whether to grant waivers from NCAA rules, regulations, and bylaws to college student-athletes.

114.    Those promises include, but are not limited to, promises that the NCAA would genuinely consider requests for waivers from NCAA rules and regulations made by college student-athletes.

115.    College student-athletes, including Plaintiff, relied upon these promises.

116.    The NCAA foresaw, or should have foreseen, that college student-athletes such as Plaintiff would rely upon those promises.

117.    The Plaintiff reasonably relied upon those promises when making decisions regarding attending college.

118.    The Plaintiff reasonably relied upon those promises to his detriment.

119.    The Plaintiff has been damaged by his reasonable reliance upon the NCAA's promises.

## COUNT V
## PER SE VIOLATION OF § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

120.    The Plaintiff incorporates by reference every allegation contained in this Complaint into this Count.

121.    Defendant has a dominant position in the relevant market.

122.    Defendant's contracts, combinations, and relationships consist of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendant and its members, vendors, and customers, the substantial terms of which are to artificially fix, decrease, maintain, and/or restrict the amount of college athletic services in the United States, its territories and possessions.

123.    Simultaneously Defendant's contracts, combinations, and relationships consist of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendant and its members, vendors, and customers, the substantial terms of which are to artificially fix, increase, maintain, and/or inflate prices paid for the performance and/or broadcast of college sports contests in the United States, its territories and possessions.

124.    And/or, alternately, Defendant's contracts, combinations, and relationships consist of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendant and its members, vendors, and customers, the substantial terms of which are to artificially fix, depress, maintain, and/or stabilize prices paid for collegiate athletic services in the United States, its territories and possessions.

125.   Defendant's actions have unreasonably restrained competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

126.   Said actions include, but are not limited to, preventing college student-athletes from transferring between NCAA member institutions.

127.   Said actions include, but are not limited to, arbitrarily and capriciously applying Defendant's own rules and regulations.

128.   Said actions include, but are not limited to, ignoring Defendant's own guidelines for transfers between NCAA member institutions by college student-athletes.

129.   The Defendant's conduct affects interstate commerce.

130.   Defendant's actions have produced and, unless restrained, will continue to produce, the following anti-competitive effects, among others:

   a.   Artificially restrain and depress the number of athletes that participate in college athletics;

   b.   Deprive athletes such as Plaintiff of the benefits of competition as to the amount, terms and conditions of grants-in-aid from NCAA member institutions;

   c.   Artificially restrain and depress the ability of athletes to benefit and profit from their name, image, and likeness; and

   d.   Artificially restrain competition in name, image, and likeness services among athletes.

131.   As a direct and proximate result of Defendants' actions, Plaintiff has been, is being, and will continue to be, injured and financially damaged.

132.    The NCAA's abridgment of the economic rights of Plaintiff and similarly situated athletes is a naked, *per se* restraint of trade.

133.    Plaintiff is entitled to recover from the NCAA treble the amount of actual damages as well as an award of reasonable attorneys' fees and costs of suit.

134.    Plaintiff is entitled to a declaratory judgment declaring as void and unenforceable any and all NCAA rules, regulations, bylaws, or decisions that prevent his playing basketball at West Virginia University.

135.    Plaintiff is entitled to a permanent injunction that enjoins Defendant from engaging in the ongoing violations described in this Complaint.

**COUNT VI**
**UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF § 1 OF THE**
**SHERMAN ACT, 15 U.S.C. § 1**

136.    The Plaintiff incorporates by reference every allegation contained in this Complaint into this Count.

137.    As an alternative to Plaintiff's Count V, if the Court determines that Defendant's conduct does not constitute, in whole or in part, a *per se* antitrust violation, Plaintiff alternatively pleads that Defendant's conduct when analyzed, in whole or in part, via the "quick look" "rule of reason" analysis or via the full "rule of reason" antitrust analysis, violates the Sherman Act.

138.    The anti-competitive nature of Defendant's actions is so blatant that a detailed review of the surrounding marketplace is unnecessary. Under this analysis, as the Supreme Court has stated, "an observer with even a rudimentary understanding of

economics could conclude that the arrangements in question would have an anti-competitive effect on customers and markets."

139.   Applying those words to the present case shows that Defendant has violated the Sherman Act.

140.   Alternatively, applying a full antitrust analysis of the present case shows that Defendant has violated the Sherman Act.

141.   At all relevant times and continuing through the resolution of this case, the NCAA has engaged and continues to engage in contracts, combinations and conspiracies that limit the ability of college student-athletes to transfer between NCAA member institutions and otherwise unreasonably restrain competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

142.   The Defendant's conduct affects interstate commerce.

143.   These actions organized through the NCAA, which possesses a dominant position in the relevant market, have produced and, unless restrained, will continue to produce, the following anti-competitive effects, among others:

  a.   Artificially restrain and depress the number of athletes that participate in college athletics;

  b.   Deprive athletes such as Plaintiff of the benefits of competition as to the amount, terms and conditions of grants-in-aid from NCAA member institutions;

  c.   Artificially restrain and depress the ability of athletes to benefit and profit from their name, image, and likeness; and

   d.   Artificially restrain competition in name, image, and likeness services among athletes.

144.   The NCAA's abridgment of Plaintiff's economic rights is a restraint of trade, and is not connected to any legitimate non-commercial goals.

145.   The anti-competitive effects of Defendant's scheme substantially outweighs any alleged pro-competitive effects or justifications that may be offered by Defendant, including that their conduct is shielded by their self-crafted concept of "amateurism."

146.   Reasonable and less restrictive alternatives are available to Defendants' current anti-competitive practices.

147.   Rational, consistent, and unbiased application of their own rules, regulations, policies and procedures would allow for a more reasonable and less restrictive alternative to Defendants' current anti-competitive practices.

148.   Plaintiff is entitled to recover from the NCAA treble the amount of actual damages as well as an award of reasonable attorneys' fees and costs of suit.

149.   Plaintiff is entitled to a declaratory judgment declaring as void and unenforceable any and all NCAA rules, regulations, bylaws, or decisions that prevent his playing basketball at West Virginia University.

150.   Plaintiff is entitled to a permanent injunction that enjoins Defendant from engaging in the ongoing violations described in this Complaint.

**COUNT VII**
**DENIAL OF ACCESS TO AN ESSENTIAL FACILITY VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2**

151.    The Plaintiff incorporates by reference every allegation contained in this Complaint into this Count.

152.    Defendant has a dominant position in the relevant market.

153.    Defendant's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations".  15 U.S.C. § 2.

154.    Defendant enjoys near complete dominance of, and exercises monopsony power in, the market for athletic services in men's and women's Division I basketball.

155.    By controlling its members and college student-athletes, the Defendant enjoys complete dominance of, and exercises monopoly power in, the market for Division I basketball performances and broadcasts, including and especially championship tournament games.

156.    Defendant controls its members' ability to allow college student-athletes to play in college sports competitions.

157.    Defendant controls college sports eligibility, which is essential to effective competition for athletic services in men's and women's Division I basketball as well for broadcasting and otherwise marketing and commercializing performances of Division I basketball.

158.    There is no way to reasonably or practically duplicate the NCAA and its ecosystem surrounding college sports.

159.    It is feasible for Defendant to allow Plaintiff to participate in college sports at West Virginia University, and it would not interfere with or significantly inhibit Defendant's ability to conduct its business.

160.    Defendant's denial of Plaintiff's access to college sports has no legitimate purpose and serves only to assist Defendant in maintaining its monopoly position and enhance its position in the market.

161.    Through its control of college sports, Defendant maintains both monopsony power and monopoly power in college sports.

162.    Defendant's conduct affects interstate commerce.

163.    Defendant's control of college sports has produced and, unless restrained, will continue to produce, the following anti-competitive effects among others:

    a.    Artificially restrain and depress the number of athletes that participate in college athletics;

    b.    Deprive athletes such as Plaintiff of the benefits of competition as to the amount, terms and conditions of grants-in-aid from NCAA member institutions;

    c.    Artificially restrain and depress the ability of athletes to enhance, benefit and profit from their name, image, and likeness; and

    d.    Artificially restrain competition in name, image, and likeness services among athletes.

164.    The NCAA's abridgment of Plaintiff's economic rights is a restraint of trade, and is not connected to any legitimate non-commercial goals.

165.    The anti-competitive effects of Defendant's scheme substantially outweighs any alleged pro-competitive effects or justifications that may be offered by Defendant, including that their conduct is shielded by their self-crafted concept of "amateurism."

166.    Reasonable and less restrictive alternatives are available to Defendants' current anti-competitive practices.

167.    Plaintiff is entitled to recover from the NCAA treble the amount of actual damages as well as an award of reasonable attorneys' fees and costs of suit.

168.    Plaintiff is entitled to a declaratory judgment declaring as void and unenforceable any and all NCAA rules, regulations, bylaws, or decisions that prevent his playing basketball at West Virginia University.

169.    Plaintiff is entitled to a permanent injunction that enjoins Defendant from engaging in the ongoing violations described in this Complaint.

**COUNT VIII**
**CONTRACT AND COMBINATION IN RESTRAINT OF TRADE**

170.    The Plaintiff incorporates by reference every allegation contained in this Complaint into this Count.

171.    Defendant is a collection of four-year colleges, universities and conferences.

172.    Defendant is in essence and is formed by a collection of agreements and conventions between its members.

173.    Defendant has a dominant position in the relevant market.

174.    Defendant's contracts, combinations, and relationships consist of a continuing horizontal and vertical agreement, understanding, and concert of action among

the Defendant and its members, vendors, and customers, the substantial terms of which are to artificially fix, decrease, maintain, and/or restrict the amount of college athletic services in the United States, its territories and possessions, including West Virginia.

175.    Simultaneously Defendant's contracts, combinations, and relationships consist of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendant and its members, vendors, and customers, the substantial terms of which are to artificially fix, increase, maintain, and/or inflate prices paid for the performance and/or broadcast of college sports contests in the United States, its territories and possessions, including West Virginia.

176.    And/or, alternately, Defendant's contracts, combinations, and relationships consist of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendant and its members, vendors, and customers, the substantial terms of which are to artificially fix, depress, maintain, and/or stabilize prices paid for collegiate athletic services in the United States, its territories and possessions, including West Virginia.

177.    Defendant had an intent to destroy competition in the relevant market.

178.    Defendant's conduct was predatory and/or anticompetitive and was directed towards accomplishing an unlawful purpose.

179.    There was a dangerous probability of Defendant's success.

180.    Defendant's actions have unreasonably restrained competition in violation of West Virginia Code § 47-18-3.

181.    Said actions include, but are not limited to, preventing college student-athletes from transferring between NCAA member institutions.

182.    Said actions include, but are not limited to, arbitrarily and capriciously applying Defendant's own rules and regulations.

183.    Said actions include, but are not limited to, ignoring Defendant's own guidelines for transfers between NCAA member institutions by college student-athletes.

184.    Defendant's actions have produced and, unless restrained, will continue to produce, the following anti-competitive effects, among others:

   a.   Artificially restrain and depress the number of athletes that participate in college athletics;

   b.   Deprive athletes such as Plaintiff of the benefits of competition as to the amount, terms and conditions of grants-in-aid from NCAA member institutions;

   c.   Artificially restrain and depress the ability of athletes to benefit and profit from their name, image, and likeness; and

   d.   Artificially restrain competition in name, image, and likeness services among athletes.

185.    As a direct and proximate result of Defendants' actions, Plaintiff has been, is being, and will continue to be, injured and financially damaged.

186.    The NCAA's abridgment of the economic rights of Plaintiff and similarly situated athletes is a restraint of trade.

187.    Plaintiff is entitled to a declaratory judgment declaring as void and unenforceable any and all NCAA rules, regulations, bylaws, or decisions that prevent his playing basketball at West Virginia University.

188.    Plaintiff is entitled to a permanent injunction that enjoins Defendant from engaging in the ongoing violations described in this Complaint.

## COUNT IX
## ESTABLISHMENT OF A MONOPOLY IN VIOLATION OF WEST VIRGINIA LAW

189.    The Plaintiff incorporates by reference every allegation contained in this Complaint into this Count.

190.    Defendant is a collection of four-year colleges, universities and conferences.

191.    Defendant is in essence and is formed by a collection of agreements and conventions between its members.

192.    Defendant has a dominant position in the relevant market.

193.    Defendant's contracts, combinations, and relationships consist of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendant and its members, vendors, and customers, the substantial terms of which are to artificially fix, decrease, maintain, and/or restrict the amount of college athletic services in the United States, its territories and possessions, including West Virginia.

194.    Simultaneously Defendant's contracts, combinations, and relationships consist of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendant and its members, vendors, and customers, the substantial terms of which are to artificially fix, increase, maintain, and/or inflate prices paid for the performance and/or broadcast of college sports contests in the United States, its territories and possessions, including West Virginia.

195.    And/or, alternately, Defendant's contracts, combinations, and relationships consist of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendant and its members, vendors, and customers, the substantial terms of which are to artificially fix, depress, maintain, and/or stabilize prices paid for collegiate athletic services in the United States, its territories and possessions, including West Virginia.

196.    Defendant had an intent to destroy competition in the relevant market.

197.    Defendant's conduct was predatory and/or anticompetitive and was directed towards accomplishing an unlawful purpose.

198.    There was a dangerous probability of Defendant's success.

199.    Defendant's conduct constitutes the establishment, maintenance or use of a monopoly or, in the alternative, an attempt to establish a monopoly of trade or commerce, any part of which is within West Virginia.

200.    Defendant's purpose in such conduct was and is excluding competition or controlling, fixing or maintaining prices and is unlawful.

201.    Defendant's actions have unreasonably restrained competition in violation of West Virginia Code § 47-18-4.

202.    Said actions include, but are not limited to, preventing college student-athletes from transferring between NCAA member institutions.

203.    Said actions include, but are not limited to, arbitrarily and capriciously applying Defendant's own rules and regulations.

204.    Said actions include, but are not limited to, ignoring Defendant's own guidelines for transfers between NCAA member institutions by college student-athletes.

205.    Defendant's actions have produced and, unless restrained, will continue to produce, the following anti-competitive effects, among others:

    a.  Artificially restrain and depress the number of athletes that participate in college athletics;

    b.  Deprive athletes such as Plaintiff of the benefits of competition as to the amount, terms and conditions of grants-in-aid from NCAA member institutions;

    c.  Artificially restrain and depress the ability of athletes to benefit and profit from their name, image, and likeness; and

    d.  Artificially restrain competition in name, image, and likeness services among athletes.

206.    As a direct and proximate result of Defendants' actions, Plaintiff has been, is being, and will continue to be, injured and financially damaged.

207.    The NCAA's abridgment of the economic rights of Plaintiff and similarly situated athletes is a restraint of trade.

208.    Plaintiff is entitled to a declaratory judgment declaring as void and unenforceable any and all NCAA rules, regulations, bylaws, or decisions that prevent his playing basketball at West Virginia University.

209.    Plaintiff is entitled to a permanent injunction that enjoins Defendant from engaging in the ongoing violations described in this Complaint.

**COUNT X**
**ARBITRARY ENFORCEMENT OF RULES, REGULATIONS, AND/OR BYLAWS**

210.   The Plaintiff incorporates by reference every allegation contained in this Complaint into this Count.

211.   The NCAA is in essence and is formed by a collection of agreements and conventions between its members.

212.   As part of those agreements, the NCAA agreed – either implicitly or explicitly – that it would make its decisions and enforce its rules in compliance with its stated regulations and rules and to do so in a non-arbitrary, non-capricious manner.

213.   Plaintiff is a third-party beneficiary of those agreements.

214.   Plaintiff is directly affected by the NCAA's decisions and enforcement of its rules, and regulations.

215.   Defendant has a duty and obligation to Plaintiff to make decisions and enforce NCAA rules in compliance with NCAA stated regulations and rules and to do so in a non-arbitrary, non-capricious, and non-selective manner.

216.   NCAA Bylaw 14.5.5.1 states that "[a] transfer student from a four-year institution shall not be eligible for intercollegiate competition at a member institution until the student has fulfilled a residence requirement of one full academic year (two full semesters or three full quarters) at the certifying institution."

217.   NCAA Bylaws include certain enumerated exceptions to Rule 14.5.5.1.

218.   NCAA Bylaws include mechanisms for waiving or exempting an individual or institution from the application of a specific regulation.

219.   Specifically, NCAA Bylaw 14.02.14 states that "[a] waiver is an exempting an individual from the application of specific regulation. A waiver requires formal approval

(e.g., an NCAA committee or a conference, as specified in the legislation) based on evidence of compliance with the specified condition or criteria under which the waiver is authorized or extenuating circumstances."

220.    Plaintiff met the necessary qualifications and applied for a waiver, providing the required documentation, of Rule 14.5.5.1 asserting facts and circumstances in accordance with Defendant's January 11, 2023, release title "NCAA Division I Committee for Legislative Relief Information Standards, Guidelines and Directives.

221.    However, Defendant denied Plaintiff's petition for waiver of Rule 14.5.5.1 and decided to enforce Rule 14.5.5.1.

222.    Defendant has arbitrarily, capriciously and selectively enforced Rule 14.5.5.1.

223.    Upon information and belief, Defendant has granted numerous waivers to Rule 14.5.5.1 to student-athletes in Division 1 collegiate athletics following the January 11, 2023, release, based upon similar facts and circumstances as Plaintiff's.

224.    Defendant has arbitrarily, capriciously and selectively enforced Rule 14.5.5.1.

225.    Plaintiff has been irreparably damaged by this arbitrary, capricious and selective enforcement.

226.    Plaintiff is currently, and will continue to be, injured by the Defendant's actions.

227.    Pursuant to 28 U.S.C. § 2201 this Court has the power to "…declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

228.   Plaintiff is entitled to a declaratory judgment declaring as void and unenforceable any and all NCAA rules, regulations, bylaws, or decisions that prevent his immediate eligibility to play basketball at West Virginia University.

229.   Plaintiff is entitled to a permanent injunction that enjoins Defendant from engaging in the ongoing violations described in this Count.

## COUNT XI
## DECLARATORY JUDGMENT

230.   The Plaintiff incorporates by reference every allegation contained in this Complaint into this Count.

231.   Pursuant to 28 U.S.C. § 2201 this Court has the power to "…declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

232.   For the reasons stated above, Plaintiff asks this Court to judge, hold, and declare that he has an economic right to market and license his name image and likeness.

233.   For the reasons stated above, Plaintiff asks this Court to judge, hold, and declare that he has a right to attend West Virginia University.

234.   For the reasons stated above, Plaintiff asks this Court to judge, hold, and declare that he has a right to play on the varsity basketball team at West Virginia University.

235.   For the reasons stated above, Plaintiff asks this Court to judge, hold, and declare that he has a right to be treated fairly by the NCAA.

236.    For the reasons stated above, Plaintiff asks this Court to judge, hold, and declare that he has a right to rational, fair, and equitable decisions by the NCAA when applying its rules, regulations, bylaws, and guidelines to him.

## COUNT XII
## RESTRAINING ORDER AND INJUNCTIVE RELIEF

237.    The Plaintiff incorporates by reference every allegation contained in this Complaint into this Count.

238.    The harm Plaintiff faces is irreparable.

239.    The time within which college athletes may compete is limited and no amount of monetary damages can mitigate or undo the harm that comes from being improperly withheld from college athletic contests.

240.    Moreover, by substantially shrinking his collegiate playing time, Defendant is also irreparably harming Plaintiff's chances at playing professionally.

241.    For these reasons Plaintiff also seeks an injunction from this Court Order from this Court enjoining the NCAA from enforcing its rules, regulations, and/or bylaws that prevent Plaintiff from immediately playing basketball for West Virginia University.

**WHEREFORE**, Plaintiff demands the following:

    a. Order from this Court enjoining the NCAA from enforcing its rules, regulations, and/or bylaws that prevent Plaintiff from immediately playing basketball for West Virginia University;

    b. All damages due to Plaintiff from Defendant's conduct;

    c. Treble damages pursuant to 15 U.S.C. § 15;

d.  For Plaintiff's attorneys' fees, costs and expenses;

E.  For such other relief that the Court may deem just and equitable.


RAEQUAN BATTLE, BY COUNSEL,



_____s/James A. Gianola_____

December 7, 2023                    James A. Gianola, Esq. (W. Va. Bar #1378)
John F. Gianola, Esq. (W. Va. Bar #10879)
Andrew Holbrook (W. Va. Bar #12663)
Lewis Gianola PLLC
1714 Mileground
Morgantown, WV  26505
(304) 291-6300